Good morning, your honors. Can everybody hear me okay? Yes, we can. Thank you. Great. May it please the court, I represent Petitioner Luis Fernando Hernández-Garcia. This case presents the unique opportunity to apply its existing precedents regarding the importance of adequate interpretation and ensuring that due process rights of respondents and removal proceedings are protected to a case involving a deaf and mute person where the interpretation was via American Sign Language and the interpretation was entirely via television. This court has identified three types of evidence which can be used to prove that interpretation was inadequate. Counsel, may I ask you to be sure to get close to the mic because you're kind of fading in and out. Okay, sorry, your honor. Is that better? That's better, thank you. Okay. This court has identified three types of evidence which can be used to prove that interpretation was inadequate. Here, the record is replete with all three types of evidence. The first is incorrectly interpreted words. The second is circumcised words. The third is circumstantial proof based on unresponsive answers. And the third is expressions by the person testifying that they're having difficulty understanding. Counsel, let me just be real candid with you about this. It seemed to me that the idea just went out of his way to make certain that your client understood everything, kept saying, do you understand? Your client would say, yes, I do understand. Sometimes there was a repetition so that it was clear that he understood. Certainly, if he did not understand in a general basis, that would raise an issue. But what's your best argument from the record here that your client did not understand some material part of the questioning and so on that you think had an impact on the ultimate result in the case? Well, there were clearly various points when the answers were just completely unresponsive, your honor. Give me some specifics, though. Okay, so on page 117 of the administrative record, he says, do you have an opportunity to talk with your attorney? And he said, yes, I have seen the attorney, but I have to say I'm still a bit confused. Hang on. And then later, the judge says, when these documents were submitted, were they read back to you in American Sign Language? No, the interpreter today, I understand, but I'm somewhat confused about, you know, it's just the video is not that clear. I'm trying to communicate, but it's not that clear. As you know, as a lawyer, many lay people are confused about legal documents and legal principles. So what you're referring to in this case about what your client said is not at all surprising. What I'm trying to focus on is where is it clear that your client's disability made it so he didn't understand what was going on, didn't understand the important questions being asked or his answers? Where in the record do you find that? Looking at page 121 of the record, Your Honor, the judge says, the information in your declaration, did it contain every type of harm or peril to you that was incurred by you or your family or after coming to the U.S.? And he says, re-ask the question. I didn't hear that. And then the judge says, does your declaration contain every type of harm or peril incurred by you and your family? And he says, I'm sorry, is that a question? That doesn't have anything to do with the form or what is an I-589. This is him just clearly not understanding what is being asked of him. Well, and that one's an illustration, but I think it goes on from there. And I think the judge does the best he can to make it clear. But that's a rather minor aspect of the case, is it not? No, I think the interpretation is the absolute crux of the case, Your Honor. I'm talking about specifically this particular point that you raised. Well, I mean, I've got other points of the transcript here that I've highlighted, Your Honor, that I had as examples for you. I mean, in fact, the judge, yes, initially he makes efforts to say, can you understand? And the client does say, or the petitioner does say a couple of times, a few times, yes, I understand. But the reality is that his continuing unresponsive answers start to annoy the judge. So at that point, the judge, instead of saying, are you understanding me, starts to basically get frustrated and annoyed with the client. So, for example, at page 144, the judge says, so you keep on not answering my question. And then the judge says, the record speaks for itself, which I think the record speaks for itself in the sense that the record is clear that the petitioner is not understanding consistently the interpreter. Counsel. Yes, Your Honor. Am I right? The interpreter is in the courtroom with the judge, and the petitioner is in detention someplace else. Is that correct? Correct. The judge, the sign language interpreter, and the attorney, George Rios, were all in the courtroom. The petitioner was basically across the street. Why was it necessary for COVID protocols that he not be there when there were already three people in person in the room? Or alternatively, they could have had the interpreter be at the detention center. Presumably the problem with the interpretation is he's seen the interpreter. It's less important that he see the judge. So if he and the interpreter were in the same room, that would be better. But let me take a different aspect of it. If I credit the problems that you raise, you still have the question of prejudice. And there we get into the police report. And help me here. As I read you, you say, well, there are problems with the police report about a pen and a pad. And you say, contrary to the government, that you really did attack the report. But I didn't see any substantive attack. The police reports are very, very detailed in terms of at least as reported what the woman said, the girl, what he said. And if I were going to be in your case and mount an attack, I would say, no, no, Mr. Hernandez didn't say I did it anyway. And he didn't pull down her pants and all the things that are said. So without that level of attack, where is the prejudice that sleeping with the girl when she's not even 14, if you credit the police report, and the rape, and the sentence, and the four charges of conviction, doesn't that make it awfully easy for the IJ to find that this was a particularly serious crime? And the interpretation has very little to do with that. Well, I think the IJ did find it easy, but I think he found that in error, Your Honor. I think one key to taking into account the police report is there was also no ASL interpreter present when he was being questioned by the police. So the whole thing with the pen and he was having to write things out, you know, there was all kinds of communication problems there. But, again, counsel, I would have more sympathy for that if you said, oh, yes, he said, you know, he said truck and he really meant Orange Grove. But there's such extensiveness that it's hard to say that that's because of the pen versus the interpreter, is it? I mean, you had the report. You could have had him say, you know, any particular kind of attack of what was wrong. I'm sorry, Your Honor. In other words, yes, you said there could be a mistake, but usually if somebody is attacking a transcript or a tape or whatever, you say, here's the reasons it could be wrong, and then you say, here's the way in which it was wrong. He didn't really say she tried self-defense. She said, oh, no offense. Okay, I could buy that if that was what you said, but you never did. Well, Your Honor, if I may, basically that was the job of the criminal court, and we don't know why he wasn't convicted of forcible rape. He was only convicted of statutory rape, so presumably the criminal court dealt with those issues, and that was their job to do so. The IJ should not have given full weight to the police reports. We submitted them because, of course, they're relevant, but we argued in our brief and in the closing statement, Mr. Rios argued that the police reports are in general inherently unreliable, and in this case were particularly unreliable because the facts of the police reports state that there was forcible rape when, in fact, that's not what he was convicted of. But in this case, are you arguing that the police report was inaccurate, unreliable? Yes. And why specifically? What was inaccurate? The fact that he committed forcible rape as opposed to statutory rape. He had a long-term relationship with this girl. Okay, well, either way, either way, statutory, forcible, it's just a question of whether her consent was required. It's not necessary and statutory, but the record shows, and I'm reading this now, he admitted what happened. He says, well, my criminal conviction, the police officer said that raped, and I didn't, that I had sex with someone underage, and that was wrong. That was my responsibility. I had apologies. So basically he's saying I had sex with this young woman. She was underage. That meets the qualifications of statutory rape. So if we even just look at it from that basis, what your client admitted, why is that not a particularly serious offense? He got seven years. That's a long time, right? Yes, yes, obviously. So why is this not a serious offense? Statutory rape is not per se a particularly serious crime, and again, because they were involved. You say it is not per se a serious crime? He got seven years for statutory rape, repeated statutory rape, right? Correct. It didn't make him a danger to the community, the fact that he had a long-term relationship with an underage girl, which I'm not condoning, but that didn't, there was no indication that he was a danger to the community, which is one of the key requirements provided. We've taken you over time, but we may see if my colleagues have additional questions after we hear from the government. So let's hear from the government first, and then we'll see whether we have additional questions. Okay, thank you, Judge Smith, and may it please the Court. Sorry, good morning, Ms. Cook, and may it please the Court, Joseph Hardy for the Attorney General. I assume the placement of the mic is fine. It is. My voice kind of boomed, so I think we're good. Your voice is just fine. Okay. Thank you. As you can see, the way we briefed it, we did it in the order that the agency did, and I think in large respect that method makes sense because of the, in terms of the due process claim, not only does a petitioner need to establish an error in the translation and the videoconferencing equipment, she also needs to show prejudice, and so to establish prejudice, she needs to show prejudice in the terms of that petitioner was unable to fairly present his case in terms of the particularly serious crime finding, and the IJA's determination that petitioner did not establish a likelihood of success, petitioner did not establish a likelihood that he would be singled out for torture upon return to the country. But since we did get seemingly just to the due process claim, I think I can shoehorn the other two issues into that. They, of course, have the due process claim, but to just handle the first part for a second, Behr v. Barr makes it clear that the IJA can consider a police report, right? Yes. Is there anything that the government would like to say about the way the police report was consulted in this case? Did that comply with Behr v. Barr? Undoubtedly, it did. Petitioner, as was raised, petitioner was the party that presented these documents. Petitioner, as we cited to the new case, Giovanni Hernandez, I think about the day after it came out last month, petitioner did not claim that anything in this police report was unreliable for any reason, whether it be that petitioner couldn't interview the police officers who conducted it. Well, they do say it's unreliable because they didn't have a sign language interpreter. Petitioner does not say that to the immigration judge. Petitioner says that to the board. She says it to or he says it to this court. Petitioner did not say that to the immigration judge. In fact, when petitioner submitted the document, if you look at the, there's a brief that petitioner submitted, I believe on July 13, 2021, petitioner specifically says only that the immigration couldn't consider the police reports to the extent that they say that he committed forcible rape against this girl. But you could consider the police report to the extent that it says that he had a consensual relationship with this victim for the two years, that the parents knew about the relationship, that he didn't have any other crimes, things of that nature. So petitioner is asking the court to, well, you can consider it to the extent that we think it makes my client looks good, but you can't consider it to the extent that you think my client looks bad. I want to be sure I understood you correctly. Did you say that it was the petitioner himself that offered the police report into the record? Yes. In July 2021, petitioner submitted the documents. He had a whole sheaf of documents that included the three police reports plus other things. Right. There's police reports where they interview initially the victim two days before. There's one where they're talking about the cell phone records. There's one where they interviewed Mr. Hernandez himself. There's another where I think a female police officer actually spoke to the woman and authenticated at least some of the videos on the cell phone, right? And that more or less related to the crime that the immigration judge did not consider, the child pornography charge, which was just a misdemeanor to be sure. Is the government's position that the police report, that since the police report, there was no objection to it before the IJ, that somehow that issue is not exhausted by the time it got to the BIA? It's in terms of actually it would be exhausted in the terms that it was raised before, I believe, in the appellate brief to the board. The issue is that in terms of, look, you have to preserve your, not preserve your record in terms of exhaustion, but you actually need to lay a foundation for your later challenging this document. He didn't say before the IJ, this is inaccurate and it's inaccurate for these reasons. He made some claims about it before the BIA and then in the opening brief here. Is that correct? Yes. And so when you look at what Petitioner himself says, if you look at what the Petitioner says to the, I think Officer Phelps was the police report, or Sergeant Phelps, I think, had asked, well, do you read lips? He says, no, I actually prefer to write it down. And so that's where you have this whole dialogue between the officer and Mr. Hernandez during that interview, where he specifically goes through and he actually says exactly what happened on that date. He says, she tried, and Judge Boggs, he's a layperson. He says it a little strangely, and I don't mean to be disrespectful, but he says something along the lines of, she tried it self-defense, but I'd do it anyway. What he states to Officer Phelps or Sergeant Phelps is exactly what the young lady said to the police officer, I think the school resource officer, on December 6th, which was two days after the incident. And so to the extent that that counsel is saying, well, he didn't have an American Sign Language interpreter, Petitioner himself didn't ask for an American Sign Language interpreter. He actually preferred to speak to the police officers seemingly through writing. And if you look at later on in that same police report, the officer asked, well, how is it that you communicate with the victim? He says, she doesn't speak American Sign Language. As counsel said, they had a two-year relationship and somehow managed to work with a girl who was, I believe, somewhere in the range of 13 to 15 years old, being able to communicate through text. Of course, a 15-year-old kid can probably text better than we can. But, I mean, at the same time, they're not communicating through an American Sign Language interpreter. He says he's tried to teach her this. She doesn't know. It's been text. He said something along the lines of when he helps her with, he said with homework. He says, my homework. I wasn't sure if he was talking about his own homework or the girl's homework, but that they communicate through computers. So writing was the way that they communicated. So now you have, to the extent that I'm saying that you have the attorney saying before the board and before this court, well, keep in mind he didn't have an American Sign Language interpreter. That's neither here nor there because your client specifically says that he's fine communicating with the police officer and apparently the young girlfriend at some point for two years through writing, which is exactly the means that he communicated with Sergeant Phelps. If you note that that police report specifically says it's a summary of the written notes, and unfortunately we don't have that. I don't know why. Maybe they weren't able to get it. Speaking of what we don't have, I take it we also don't have the criminal proceedings as to exactly why there were four charges and exactly why he got seven years? We don't know why he got seven years. We do know that the seven years were specifically for the police. I mean, I understand, but it says that there were four counts. I mean, by his account, there could have been hundreds of counts. Right. But we don't know which four and at what time frame. I mean, these ages I sort of calculated from what's in the record. If you look at the charging documents, the charging document says that it counts, I believe, 10, 11, 12, and 13. Is that charging document in the record? The charging document is there. Is it a reference? It is among the documents that were submitted by DHS. It's behind the form I-213. You'll see the charging document. We'll try to look for it. There's an abstract. Sometimes finding things is difficult, counsel, just as an aside. In your 28J letter, you cited to your own brief at page 52, which doesn't exist. It's probably page 42, but it led me on a wild goose chase. But sometimes it's hard to find things, so you say it's behind the 213. So there is, and it may well be somewhere around Exhibit 2. I have the page numbers here. Thank you. So if you're looking for the charging document by the district attorney, it's AR-422. 422. And then it keeps going, and it does, as you suggested, it does list the counts, and it has the date range, and it has the rough age of the record. Right, right, right, right. So we know for sure. I'm sorry, Judge Potter. Thank you, Judge Owens. Better than the average teenager. And Petitioner, I would just say, if I, I guess, just go back to the, if you consider it, the immigration judge considered the facts that, according to the police report, which reflect what Petitioner stated, we don't have the, seemingly, the direct dialogue between them, you know, the handwritten notes, because I don't know why Petitioner didn't submit that along with the police reports. They're directly referenced. And the police reports, and I do see the time. Yeah. Let me ask my colleague. Do either of my colleagues have additional questions? I'm good. I think we're good. Thank you so much. Thank you very much. Now, counsel, Ms. Cook, we're over time, but let me ask my colleagues whether either has additional questions for you. I just have one, and that is, what is your best argument that your client suffered prejudice as a result of the Well, Your Honor, first of all, Paris Laster makes clear that an alien only has to We're not hearing you. Counsel, you've got to speak into the microphone, please. Sorry, is that better? A little, not much. Because I haven't changed anything. Oh, goodness. The Paris Laster case, which is the seminal case on interpretation, makes clear that the Petitioner only has to show potential prejudice. And the fact that the IJ took into account and gave full weight to the police reports in finding that what my client did was tantamount to forcible rape, that was prejudice. And also, as Paris Laster says, that basically no interpretation amounts to no record or something like that. And that's what we have here. We have such a poor record with such poor interpretation. But, Counsel, you make much of the difference between forcible rape and statutory rape, but what does your client's hearing impairment have to do with that? What did he say or not say, or what would he have said that would have made any difference? Well, like the Petitioner and Paris Laster, we don't know because all we have is a garbled record. As the judge says, the record speaks for itself. The record speaks for itself that the Petitioner could not understand the interpreter or the judge many times by his unresponsive answers. Okay. All right. I think we're good. And, Counsel, if I could just make sure, the case you were citing is Paris Laster? Is that correct? Correct. All right. Thank you. Thank you. Okay. I think we are done with our oral arguments today. The case just argued is submitted, and the Court stands adjourned for the day.
judges: Boggs, SMITH, OWENS